**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **SAMUEL J. CALDWELL,** | Case No. 3:19 CV 1909 |
| Plaintiff, | Judge James G. Carr |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Plaintiff Samuel J. Caldwell ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 22, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in November 2015, alleging a disability onset date of April 15, 2015. (Tr. 1399, 1406). His claims were denied initially and upon reconsideration. (Tr. 1315-22, 1327-36). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on December 14, 2017. (Tr. 68-118). On June 27, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 36-60). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on August 21, 2019. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background, Function Reports, and Testimony

Born in 1974, Plaintiff was 41 years old on his alleged onset date. *See* Tr. 1399, 1406. Plaintiff had a high school education, but had received special education services for a learning disability. (Tr. 74). Plaintiff still had difficulty with reading. (Tr. 96, 102-03). He had a driver's license, having passed the written test "with a lot of trouble" in high school. *See* Tr. 75. Plaintiff lived with his mother. (Tr. 90-91). Prior to that, he lived with a girlfriend. (Tr. 109). He worked as a welder for several years after graduating high school (Tr. 75-82), and also worked as a forklift driver (Tr. 81-82, 111). As a welder, he had difficulty reading blueprints and needed help. (Tr. 77).

*April 2016 Function Report*

In an April 2016 function report, Plaintiff reported he sometimes made simple meals, but did not do house or yard work. (Tr. 1468). He could leave the house by himself, sometimes went out with a friend; he shopped with his mom once per month. (Tr. 1469). He did not like changes in routine or being around other people. (Tr. 1472). He stated he got along "ok" with authority figures, but had arguments with co-workers in the past. (Tr. 1473).

*December 2017 Hearing*

Plaintiff testified that he was 5'8" tall and 461 pounds; his weight affected his mental health. (Tr. 83-84). He had a diagnosis of bipolar disorder; his medications helped somewhat: "I

---

1. Plaintiff's arguments are limited to the ALJ's consideration of his mental functioning. As such, the undersigned summarizes only the testimony and medical records related to Plaintiff's mental functioning and omits records related solely to his physical functioning. Further, the undersigned focuses this summary primarily on records near or post-dating Plaintiff's alleged onset date of April 15, 2015.

2

still get a little depressed, and I get anxiety and I feel restless. But I'm not an angry person. I'm not belligerent like I was. I just feel like I'm in a better place." (Tr. 89). Despite this, Plaintiff had good days and bad days. (Tr. 89-90).

Plaintiff described himself as a "loner", noting that he rarely spoke with anyone "unless [he] need[ed] a ride, or something like that." (Tr. 92). He went out to eat or shopping "[o]nce in a while" with his mother. *Id.*; *see also* Tr. 100. Plaintiff believed he was unable to work, in part, because he "just [did not] want to be around people." (Tr. 99). He described his depression symptoms as wanting to be left alone, and wanting to lay down. (Tr. 96-97). His medications sometimes made him drowsy, but he was "calm", "not upset" and "level". (Tr. 97). However, despite his medications, he sometimes heard voices, or got "really upset", "violent, angry", and could not control himself. (Tr. 100-01) ("It doesn't happen often, but it does happen").

For household chores, Plaintiff took the trash out, took care of his bed linens (with breaks), and "sometimes" did his own laundry. *Id.* He did not sweep, vacuum, or mow the lawn, and had difficulty making meals due to his inability to stand for lengthy periods. (Tr. 91-92). During a typical day, Plaintiff slept a lot, watched television, and looked at magazines. (Tr. 92).

Plaintiff's mother noted Plaintiff became angry when off his medication, including an incident where he threw a telephone at her. (Tr. 106). She sometimes had to remind Plaintiff to take his medication. (Tr. 107).

<u>Relevant Evidence</u>

*Educational Records*

As a child, Plaintiff underwent a pre-kindergarten screening that resulted in a documented IQ score of 97. (Tr. 1573). Two years later, he had an IQ score of 85 (Tr. 1578), and three years after that, a score of 92 in the fifth grade (Tr. 1581). He had an individualized education plan in

school due to learning disabilities. *See* Tr. 1435-42, 1573-76, 1578-83, 1585-97, 1601-08. At the age of 18, he underwent a psychological examination through his school, which revealed a full-scale IQ score of 80 ("at the upper-end of the below-average range"). (Tr. 1602).

*Activities*

Plaintiff reported various activities to his medical providers. In July 2015, Plaintiff reported he had increased his exercise. (Tr. 2201). In September 2015, he stated that his girlfriend did most of the grocery shopping, but he did the cooking. (Tr. 1674). In October 2015, he was walking around a lake two to three times per week. (Tr. 1802). He told a consultative examiner in December 2015 that he did dishes, laundry, picked up after himself, mowed the grass, and shopped for food about once per month with his mother or friend. (Tr. 2257). In March 2016, Plaintiff reported exercising at a local gym, "getting his bicycle ready for warmer weather", and "going to support meetings". (Tr. 2633). In May, he reported exercising at "the weight clinic". (Tr. 2667). A mental health provider in July 2016 noted Plaintiff's hobbies included driving, and visiting his parents. (Tr. 2763). Plaintiff also told a counselor in January 2017 that he went "junking" (he went "onto the property of a local business to take old motorcycle batteries to junk and resell"). (Tr. 2859). In August 2016, he rode his bike for an hour daily. (Tr. 3214). In October 2017 he discussed taking a two-day trip with his mother out of town (Tr. 3107); later that month he noted he went to a casino with his mother and gambled "a little bit". (Tr. 3113). He continued riding his bike. (Tr. 3111).

Plaintiff reported a good relationship with his mother (Tr. 2255, 2597); he reported "one good friend" in May 2016 (Tr. 2767) and "a couple good friends he [saw] every couple of weeks" in December 2015 (Tr. 2257), and lived with a girlfriend for some time (Tr. 2255, 2762, 2767). He did not have a good relationship with his siblings or his girlfriend's family. *See* Tr. 2255, 2597, 2762. Plaintiff got a ride to medical appointments form his mother, friend, or a taxi. (Tr. 2256).

*Medical Records*

In February 2015, Plaintiff underwent a psychological consultation and evaluation for bariatric surgery. (Tr. 2596-98). He reported working as a welder until April 2014 but lost his job due to his weight. (Tr. 2597). Plaintiff had difficulty reading. (Tr. 2597-98). Plaintiff further had problems with short and long-term memory, concentration, and attention span. (Tr. 2597). The evaluator observed Plaintiff "would benefit from seeking counseling especially in regard to his long term anger issue." (Tr. 2598).

In April 2015, Plaintiff told a nurse practitioner he was taking Paxil. (Tr. 2180-81). His mental and psychiatric examinations were normal and Paxil was refilled. (Tr. 2182-83). On examination, Plaintiff had an intact memory, normal attention and concentration, normal speech and communication ability, normal mood, appropriate affect, normal thought process and content, and intact judgment and insight. *Id.* Later that month he reported he "like[d] the [P]axil for his mood", but it caused weight gain. (Tr. 2184). He was prescribed Prozac. (Tr. 2188). At a counseling session the same day, Plaintiff had an anxious and depressed mood, but normal insight, judgment, affect, and thought content. (Tr. 2191).

In June 2015, Plaintiff reported feeling "ok" after the medication switch, but was still gaining weight. (Tr. 2193). The provider continued Prozac. (Tr. 2196). That same day, Plaintiff told a counselor he was anxious, depressed, and irritable. (Tr. 2198). Plaintiff had intense motor activity, a demanding attitude, "intense" eye contact, pressured speech, an agitated affect and depressed and anxious mood, but normal judgment and "some" insight". (Tr. 2199). In July, Plaintiff had lost weight after increasing exercise. (Tr. 2201). That same day, he told a counselor his symptoms had improved since switching to Prozac and described them as mild. (Tr. 2206). He had "[q]uestionable" insight but a normal affect and euthymic mood. (Tr. 2207).

In August, Plaintiff's mood was angry after expressing dissatisfaction with medical appointments. *See* Tr. 2209-13. His affect was appropriate, he was oriented, and his judgment "for everyday activities and social situations" was within normal limits; his insight was intact. (Tr. 2212). In September, his mood was depressed; his affect was appropriate, he was oriented, his judgment "for everyday activities and social situations" was within normal limits, and his insight was intact. (Tr. 2217). At another visit in September, Plaintiff was noted to have normal: mood, affect, speech, behavior, judgment, thought content, cognition, and memory. (Tr. 1701). In October, Plaintiff reported no mental health complaints. (Tr. 2222). At another appointment that month, Plaintiff had normal mood, affect, and behavior. (Tr. 1658). In November, he reported he had been referred to see a psychiatrist (Tr. 2225), but denied mental health complaints (Tr. 2228), and had a normal psychiatric examination (Tr. 2229). At a counseling appointment that day, Plaintiff took his medication (Prozac and Trazodone) as prescribed. (Tr. 2231). He had an anxious mood, normal affect, questionable judgment, and some insight. (Tr. 2232). In December, Plaintiff denied psychiatric symptoms (Tr. 2616), and had a normal psychiatric examination (Tr. 2617). At a weight management visit that month, Plaintiff was observed to have normal: mood, affect, speech, behavior, judgment, thought content, cognition, and memory. (Tr. 2999).

Also in December 2015, Plaintiff underwent a psychological consultative examination with Carol Patrick, Ph.D. (Tr. 2254-64). On examination, Dr. Patrick noted Plaintiff was able to recall two of three words after five minutes, and was able to name four past presidents since 1980. (Tr. 2257-58). Plaintiff had difficulty with arithmetic. (Tr. 2259). He did not make eye contact, and Dr. Patrick observed "no indications of anxiety." (Tr. 2260-61). His speech was intelligible, he had flat facial expressions, and a positive attitude. (Tr. 2261). He reported suicidal ideation "sometimes". (Tr. 2262). He had "no problems" formulating or articulating his thoughts, no

problems with focus, and a logical thought process. *Id.* Dr. Patrick observed him to have a normal mood, and that he was "calm and focused"; however, he had a flat affect. *Id.* Dr. Patrick diagnosed adjustment disorder with depressed mood and also noted Plaintiff was likely learning disabled; she assigned a GAF score of 50[2]. (Tr. 2263).

In January 2016, Plaintiff reported overeating "when he was out of work and depressed"; the provider requested a behavioral health consultation. (Tr. 2620). His mood was depressed, and insight for his current condition impaired. (Tr. 2622). His Prozac prescription was refilled. (Tr. 2623). At a concurrent counseling appointment Plaintiff reported his medications were working "as evidenced by decrease in irritability". (Tr. 2624). His mood was anxious, his affect normal, his judgment questionable, and he had "[v]ery [l]ittle" insight. (Tr. 2625).

In March 2016, Plaintiff reported an argument with his significant other that led to irritability and then chest pain. (Tr. 2627). He denied depression (Tr. 2629) and had a normal psychiatric examination (Tr. 2630). Two weeks later, Plaintiff was sleeping somewhat better and had lost weight after exercising at a local gym. (Tr. 2633). He reported the addition of hydroxyzine did not help his anxiety and caused headaches. *Id.* He again denied depression (Tr. 2634), and had a normal psychiatric examination (Tr. 2635-36). The provider discontinued Prozac and prescribed Lamictal. (Tr. 2636); *see also* Tr. 2639 ("switching to [L]amictal to better stabilize moods and curb irritability/frustration"). At counseling, Plaintiff had a tearful affect, and labile/irritable mood. (Tr. 2639). At a weight management appointment that month, Plaintiff had normal: mood, affect,

---

[2]. A Global Assessment of Functioning or "GAF" score is a "clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n.7 (6th Cir. 2006). A score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).") Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000).

speech, behavior, though content, judgment, cognition, and memory. (Tr. 2705). In April, Plaintiff was "unsure if the medication is helping with his moods or sleep". (Tr. 2641). At a concurrent counseling appointment, he reported Lamictal made him "more emotional". (Tr. 2646). He reported anxiety, depression, and difficulty sleeping (Tr. 2643), and on psychiatric examination, the provider noted his mood was angry and affect was appropriate. (Tr. 2644). She discontinued the Lamictal "due to upcoming [weight] loss surgery and unsatisfactory response at this time." *Id.* At his counseling appointment, Plaintiff's PHQ-9 score was "0-9 Mild". (Tr. 2646). His mood was irritable, his affect and judgment normal, and he had "[v]ery [l]ittle" insight. (Tr. 2647). At another visit with a weight management program that month, Plaintiff was noted to have normal: mood, affect, speech, behavior, judgment, thought content, cognition, and memory. (Tr. 2687).

In May 2016, Plaintiff sought treatment with Lutheran Social Services for depression. *See* Tr. 2767-74. On examination, Plaintiff was anxious and self-conscious, with clear and logical speech. (Tr. 2772). He reported depression, mood swings, and anxiety; the anxiety often led to anger. (Tr. 2773). The provider diagnosed bipolar disorder and a general anxiety disorder (Tr. 2773) and referred Plaintiff for both therapy and medication management (Tr. 2774). Plaintiff attended counseling appointments in June and July, where he discussed frustration over an argument with his girlfriend (Tr. 2776), fear of his own anger (Tr. 2778, 2784), and his anger toward his girlfriend's family (Tr. 2780, 2782-83). He stated he could "be just fine and then have something small happen and [he] get[s] angry way out of context for the situation". (Tr. 2784).

In a July 2016 new evaluation appointment with psychiatrist Subrata Roy, M.D., Plaintiff reported mood swings, difficulty focusing and concentrating, poor anger management, insomnia, and difficulty getting along with others. (Tr. 2795). Plaintiff was alert and oriented, with an anxious mood, reactive affect, and limited judgment and insight; his suicidal ideation was "questionable".

8

*Id.* Dr. Roy diagnosed bipolar disorder, impulse control disorder, and intermittent explosive behavior; she assigned a GAF score of 45. (Tr. 2796). She instructed Plaintiff to continue his current medications (VPA ER and Trazodone), increase his amitriptyline, and start Latuda. *Id.* The following month, Plaintiff reported he was "the same"; he was advised to stop Latuda as it caused a rash. (Tr. 2797). His mood was anxious and his affect was guarded; his insight and judgment were again noted to be limited. *Id.* Dr. Roy prescribed Saphris and instructed Plaintiff to continue his other medications. *Id.* In September, Plaintiff was again "the same", but reported side effects from Saphris. (Tr. 2799). Dr. Roy discontinued Saphris and started Risperdal. *Id.* In October, Plaintiff reported increased anxiety and sadness; he was advised to add Zoloft. (Tr. 2800). Dr. Roy noted Plaintiff had an anxious mood, reactive affect, and fair insight and judgment. *Id.* In November, Plaintiff complained of anxiety, depression, and hearing voices. (Tr. 2802). Dr. Roy noted Plaintiff had an anxious mood, reactive affect, and limited insight and judgment; he increased Plaintiff's medication dosages. *Id.*

In March 2017, Plaintiff returned to Dr. Roy reporting he was "doing better". (Tr. 2804). Dr. Roy observed Plaintiff was cooperative with organized and goal-directed speech. *Id.* He had an anxious mood and reactive affect; his insight and judgment were fair. *Id.* Dr. Roy continued Plaintiff's medications. *Id.* In May, Plaintiff was "doing fairly well", but complaining of increased anxiety. (Tr. 2806). His mental status examination was the same as in March. *Compare* Tr. 2806 *with* Tr. 2804. Dr. Roy continued Plaintiff's medications. (Tr. 2806). In June, Plaintiff was "not doing well", with "increased sadness" because he broke up with his girlfriend. (Tr. 2807). Dr. Roy increased Plaintiff's Zoloft dosage. *Id.* His mental status examination was the same, except his insight and judgment were noted to be limited. *Id.*

In September 2017, Plaintiff told Dr. Roy he was "doing well". (Tr. 3309). On examination, Dr. Roy observed Plaintiff had normal behavior and an anxious mood; his affect was "not angry, not blunt, not labile and not inappropriate". (Tr. 3309-10). There were no abnormalities in his speech, and he was "not agitated, not aggressive, not hyperactive, not slowed, not withdrawn, not actively hallucinating and not combative." (Tr. 3310). He had paranoid thoughts, but his thought content was not delusional. *Id.* His cognition and memory were normal, and although his judgment was impaired, he was "attentive". *Id.* Dr. Roy continued Plaintiff's medications. *Id.* In October, Plaintiff was again "doing well". (Tr. 3312). He had focused attention, was cooperative, had good eye contact, normal and soft speech, a neutral mood, a full affect, goal-directed thought processes, good insight, and intact judgment and memory. (Tr. 3312-13). He reported sleeping well. (Tr. 3313). Dr. Roy advised Plaintiff to continue his medications. *Id.*

*Opinion Evidence*

In December 2015 after examining Plaintiff, Dr. Patrick described Plaintiff's functional abilities. (Tr. 2264). She explained that he could likely follow verbal instructions, but "[i]f he had to read the instructions he would likely have great difficulty understanding and following them." *Id.* Plaintiff's concentration and persistence was poor; he had difficulty with memory items and arithmetic. *Id.* She further noted that it would be "very difficult for him to appropriate[ly] interact with coworkers and supervisors", noting that "[h]e describes himself as edgy, he appears to be very sensitive to criticism and responds with anger." *Id.* She explained Plaintiff had "very poor coping skills", and "poor abstract reasoning and poor academic skills which often would result in poor ability to handle work related pressures." *Id.* Dr. Patrick concluded that Plaintiff's "primary difficulty appears to be due to a a learning disability and sensitivity to negative comments/bullying from others." *Id.*

10

Dr. Patrick also completed a mental residual functional capacity assessment form in which she indicated Plaintiff was moderately limited in his ability to remember locations and work-like procedures, not significantly limited in his ability to remember or carry out very short and simple instructions, and markedly limited in his ability to understand and remember or carry out detailed instructions. (Tr. 2253). He had no significant limitations in the ability to perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, or complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. *Id.* He was moderately limited in his ability to maintain attention and concentration for extended periods and his ability to work in coordination with or proximity to others. *Id.* Dr. Patrick further opined Plaintiff had social interaction limitations: marked limitation in the ability to interact appropriately with the general public and moderate limitation in the ability to accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers; he had no significant limitation in the ability to ask simple questions or request assistance, or maintain socially appropriate behavior and adhere to basic standards of cleanliness and neatness. *Id.* Dr. Patrick also opined Plaintiff had adaptation limitations, namely moderate limitations in the ability to respond appropriately to workplace changes, and to be aware of normal hazards and take appropriate precautions and marked limitation in the ability to travel in unfamiliar places or use public transportation; he had no significant limitation in the ability to set realistic goals or make plans independently of others. *Id.* Dr. Patrick further opined that based on Plaintiff's history and examination, she believed Plaintiff was "[u]nemployable". *Id.*

In May 2016, State agency psychologist Deryck Richardson, Ph.D., reviewed Plaintiff's records and opined that, although he had a severe impairment of a learning disorder, and "while

he did report some symptoms of anxiety and depression, these did not appear to be severe enough to interfere with his psychologically based function". (Tr. 1241). He concluded Plaintiff had "mild" limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. *Id.*

In August 2016, State agency psychologist Irma Johnston, Psy.D., reviewed Plaintiff's records and offered a mental residual functional capacity opinion. (Tr. 1282, 1286-88). She found Plaintiff had a severe affective disorder impairment. (Tr. 1282). Dr. Johnston opined Plaintiff had no understanding or memory limitations, but was moderately limited in areas of sustained concentration and persistence. (Tr. 1286-87). She explained:

> Claimant exhibits a limited frustration tolerance. He is able to carry out very short and simple instructions but would likely struggle with more complex instructions. He should not be expected to work appropriately in a fast-paced or high production quota environment. He should work apart from others for the majority of his work day. He may need additional breaks.

(Tr. 1287). Dr. Johnston also opined Plaintiff was moderately limited in his ability to interact with the public, respond appropriately to supervisors, and get along with coworkers, explaining:

> Has difficulty with his anger. Frustrated easily. Claimant can interact with others on an infrequent, superficial basis. Criticism from supervisors should be constructive. He should not be in a role where he resolves customer complaints, mediates, or supervises.

(Tr. 1288). Finally, Dr. Johnston opined Plaintiff had adaptation limitations in that he was moderately limited in his ability to respond to changes in the work setting: "[H]e appears to have a reduced frustration tolerance. He can adapt to infrequent changes in the work place as long as they are explained in advance and introduced gradually." (Tr. 1288).

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 55-58). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional

12

capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 112-13. The VE responded that such an individual could not perform Plaintiff's past work, but could perform other jobs such as office helper or mail clerk. (Tr. 114). The VE further testified being off task fifteen percent or more of the workday is considered work-preclusive, and employers generally provide one 30-minute break and two fifteen-minute breaks in an eight-hour workday. (Tr. 115).

ALJ Decision

In her July 2, 2018 decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2018 and had not engaged in substantial gainful activity since his April 18, 2015 alleged onset date. (Tr. 39). She found he had severe impairments of: "obesity; migraines and/or tension headache; and psychological conditions variously described as: major depressive disorder, bipolar one disorder, generalized anxiety disorder, impulse control disorder and intermittent explosive disorder" *Id.* She found, however, that none of these impairments – individually or in combination, met or medically equaled the severity of a listed impairment. (Tr. 40). The ALJ then concluded Plaintiff had the following mental RFC[3]:

> [He] can understand, remember, and carry out simple, routine tasks, make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes. [He] cannot engage in direct public service work and can only be in the proximity of the general public on an occasional basis. He can have occasional interaction with supervisors and coworkers. [He] cannot perform work that requires a daily production quota, i.e., piecework, or high production quotas.

(Tr. 43). The ALJ found Plaintiff unable to perform any past relevant work (Tr. 57), but given his age, education, work experience, and RFC, there were jobs in significant numbers in the national economy he could perform (Tr. 58). Therefore, the ALJ found Plaintiff not disabled. (Tr. 60).

---

3. The RFC also contained significant physical restrictions, which are not at issue here. *See* Tr. 43.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

14

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff challenges the ALJ's consideration of the opinion evidence. He contends that Dr. Patrick (the consultative examiner) and the State agency reviewer on reconsideration offered greater limitations than the ALJ accounted for in his RFC, and the ALJ's rationale for discounting those opinions lacks the support of substantial evidence. For the reasons discussed below, the undersigned finds no error and recommends the ALJ's decision be affirmed.

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second, is a non-treating source, which are those medical sources who have examined

15

but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. A treating physician's opinion entitled to "controlling weight" if it (1) is supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *See* 20 C.F.R. §§ 404.1527(c)

For medical opinions from non-treating physicians, an ALJ is to consider the same factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). While "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. An ALJ need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir.

2016); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). ALJs must only provide a meaningful explanation regarding the weight given to particular medical source opinions. *See* SSR 96-6p, 1996 WL 374180, at *2. Moreover, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

Dr. Patrick

The ALJ explained her consideration of Dr. Patrick's opinion, assigning it "little weight" (Tr. 53), and addressing several of the required statutory factors, *see* Tr. 53-54.

First, she explained that Dr. Patrick's opinion was based on "a snapshot of the claimant's functioning during a one-time consultative examination rather than the claimant's longitudinal functioning[.]" (Tr. 53). This appropriately addresses the length of treatment relationship factor. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").[4] Although Plaintiff is correct that "[j]ust because Dr. Patrick only examined Mr. Caldwell on a single occasion does not give the ALJ authority to completely discredit Dr. Patrick's opinions rendering them unpersuasive" (Doc. 11, at 10), this is simply one of several reasons provided by the ALJ. *See* Tr. 53-54. The ALJ's language could have perhaps been more precise, but in context, it is clear that the ALJ did not discount Dr. Patrick's opinion *solely* because she was a one-time examiner.

---

4. Plaintiff contends that it is inconsistent for the ALJ to discount Dr. Patrick's opinion on this basis while at the same time ascribing greater weight to a non-examining physician opinion. (Doc. 11, at 11) ("The ALJ's convenient analysis of the opinion evidence here is internally inconsistent."). But this is just one factor to be considered by the ALJ, and for the reasons discussed herein, the undersigned finds the ALJ appropriately considered several factors in independently analyzing the opinion evidence of record.

Second, the ALJ explained that Dr. Patrick's "opinion that the claimant is unemployable is also not a medical opinion, but an administrative finding dispositive of a case[.]" (Tr. 53). This, again, is an appropriate consideration. *See* 20 C.F.R. § 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."; 20 C.F.R. § 404.1527(d)(3), 416.927(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) ("When a treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled or unable to work— the opinion is not entitled to any particular weight.") (internal citations omitted).

Third, and finally, the ALJ explained she found Dr. Patrick's opinion that Plaintiff "would be markedly limited in his mental work abilities" inconsistent with the record. (Tr. 53). Plaintiff is correct that Plaintiff's "greatest struggles relate to his limited intelligence and anger issues" (Doc. 11, at 1), and that such issues are documented in the record. But the ALJ's explanation for discounting Dr. Patrick's more restrictive opinion based on the record as a whole, which she detailed over five paragraphs (with citations to relevant records), is supported by substantial evidence. Within that analysis, the ALJ noted that – in contrast to Dr. Patrick's "severe restrictions", Plaintiff had not required psychiatric hospitalization. (Tr. 53). She further noted that "[t]he objective examinations . . . failed to demonstrate the significant abnormalities associated with such severe restrictions." *Id.* The ALJ acknowledged that Plaintiff's medical records demonstrated variations in mood. *See id.* ("The claimant's primary care treatment records found he was angry or depressed at times . . ." ); Tr. 54 ("The claimant's therapy records as well displayed that . . . the claimant's mood was anxious, labile, irritable and/or depressed at times . . .); Tr. 54

("[M]edication management treatment records indicated the claimant was anxious and/or agitated at times . . . "). But the ALJ noted that Plaintiff, as well, frequently demonstrated normal or mild findings such as: full orientation, cooperative behavior, appropriate affect, logical thought process, intact judgment, and intact insight. *See* Tr. 53-54.

The ALJ's description of Plaintiff's records is supported. *See* Tr. 2191 (April 2015 – anxious and depressed mood, but normal insight judgment, affect, and thought content); Tr. 2182-83 (April 2015 – intact memory, normal attention and concentration, normal speech, normal mood, appropriate affect, normal thought process and content, and intact judgment and insight); Tr. 2199 (June 2015 – anxious and depressed mood, agitated affect, demanding attitude, pressured speech, normal judgment and "some" insight); Tr. 2207 ("[q]uestionable" insight but normal affect and euthymic mood); Tr. 2212 (August 2015 – angry mood, appropriate affect, normal judgment, intact insight); Tr. 2217 (September 2015 – depressed mood, appropriate affect, normal judgment, intact insight); Tr. 1701 (September 2015 – normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory); Tr. 1658 (October 2015 – normal mood, affect, and behavior); Tr. 2229 (November 2015 – normal mood, appropriate affect, normal judgment, intact insight); Tr. 2232 (November 2015 – anxious mood, normal affect, "[q]uestionable" judgment, "[s]ome" insight, normal thought process and content, calm motor activity, clear speech); Tr. 2617 (December 2015 – normal mood, appropriate affect, normal judgment, intact insight); Tr. 2999 (December 2015 – normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory); Tr. 2262 (December 2015 – normal mood, flat affect, "calm and focused", intelligible speech, no problems with focus, logical thought process); Tr. 2622 (January 2016 – depressed mood, insight for current condition impaired, appropriate affect, normal judgment); Tr. 2625 (January 2016 – anxious mood, normal affect, "[q]uestionable" judgment, and "[v]ery

[l]ittle" insight); Tr. 2639 (March 2016 – labile/irritable mood and tearful affect); Tr. 2630 (normal mood and affect, normal judgment, intact insight); Tr. 2635 (March 2016 – normal mood, appropriate affect, normal judgment, intact insight); Tr. 2705 (March 2016 – normal mood, affect, speech, behavior, thought content, judgment, cognition, and memory); Tr. 2644 (April 2016 – angry mood, appropriate affect); Tr. 2647 (April 2016 – irritable mood, normal affect and judgment, "[v]ery [l]ittle" insight); Tr. 2687 (April 2016 – normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory); Tr. 2772 (May 2016 – anxious mood, clear speech); Tr. 2795 (July 2016 – anxious mood and reactive affect); Tr. 2797 (August 2016 – anxious mood and guarded affect); Tr. 2800, 2802, 2804, 2806, 2807 (October, November 2016 & March, May, June, July 2017 – anxious mood and reactive affect, insight and judgment "fair" or "limited"); Tr. 3309-10 (September 2017 – normal behavior, anxious mood, affect "not angry, not blunt, not labile and not inappropriate", normal speech, cognition, and memory, "not agitated, not aggressive, not hyperactive, not slowed, not withdrawn, not actively hallucinating and not combative", and paranoid thought content); Tr. 3312-13 (October 2017 – focused attention, good eye contact, normal speech, neutral mood, full affect, goal-directed thought process, good insight, intact judgment, intact memory, and intelligence within normal limits).

The ALJ's interpretation of these records – to find that Plaintiff had some mental limitations in his ability to work, but not to the same degree as Dr. Patrick opined – is also supported. The fact that Plaintiff was repeatedly noted to be cooperative in his treatment notes (*see* Tr. 1662, 1700, 1707, 1805, 2191, 2206, 2610, 2625, 2639, 2647, 2669, 3217, 3309, 3312) undermines Dr. Patrick's more restrictive opinion that Plaintiff would have difficulty interacting with supervisors and coworkers and marked limitation in interacting with the general public (*see* Tr. 2253, 2264). Further, elsewhere in the opinion, the ALJ discussed that Plaintiff himself

reported he got along "ok" with authority figures, was able to go out in the community on a regular basis, maintained a good relationship with his mother, and spent time with a friend. *See* Tr. 42; *see also* Tr. 1473, 1802, 2255, 2257, 2263, 2667, 2597, 2762 , 2767, 3107, 3111, 3113, 3214. The ALJ reasonably accounted for Plaintiff's social interaction limitations by limiting him to no "direct public service work", and being "in the proximity of the general public on an occasional basis" and "occasional interaction with supervisors and coworkers. (Tr. 43).

Further, in contrast to Dr. Patrick's statements that Plaintiff would have difficulty handling work pressures due to poor academic skills (Tr. 2264), the ALJ acknowledged that Plaintiff had an IEP due to learning disabilities, but further noted that he: (1) "completed a trade program for welding during such time with education records reporting his demonstrated very good welding skills and he coped very well with difficulties that academics presented"; (2) "obtained his driver's license as well, which demonstrates that the claimant has completed all the requisite requirements, including passing a written and oral driving examination"; (3) "was able to be employed as a welder for many years after graduating high school, which required [that he] . . . use specialized machines, tools and equipment as well as the technical knowledge and skills he learned during the welding program; and (4) "work[ed] as a forklift driver, which the vocational expert classified as semi-skilled work". (Tr. 54). Each of these statements is supported by the record. *See* Tr. 1607 ("Sam demonstrates very good welding skills. Sam copes very well with difficulties that academics present."); Tr. 75 (Plaintiff's testimony that he passed the written driving test "with a lot of trouble" in high school); Tr. 1475-82 (description of Plaintiff's welding jobs); Tr. 75-82 (Plaintiff's testimony about his past work); Tr. 111 (VE testimony that Plaintiff's work as a forklift driver was semi-skilled). Plaintiff's ability to complete a trade program and work as a welder and a forklift driver provide substantial support for the ALJ's decision to discount Dr. Patrick's more restrictive

opinion regarding work pressures. Moreover, the undersigned notes that the ALJ accommodated some restrictions regarding work pressures, finding Plaintiff could "respond appropriately to usual work situations and changes in a *routine* work setting that is *repetitive from day to day with few and expected changes*." (Tr. 43) (emphasis added). And Plaintiff's ability to pass a written driving test and IQ score in the "upper end of the below average range" provide substantial support for the ALJ's decision to discount Dr. Patrick's opinion that Plaintiff would have great difficulty with written instructions. (Tr. 2264). Again, the ALJ accommodated some restriction with regard to detailed instructions, restricting Plaintiff to "simple, routine tasks." (Tr. 43).

Moreover, the ALJ analyzed and cited evidence elsewhere in the opinion to support her RFC, which reasonably demonstrates Plaintiff was less restricted than Dr. Patrick opined. *See* Tr. 50-52 (noting, *inter alia*, that Plaintiff did not seek treatment with a psychiatrist until July 2016, that Plaintiff's symptoms were exacerbated by situational stressors, and demonstrated improvement with medication). These, again, are substantially supported observations. *See, e.g.*, Tr. 2795 (July 2016 initial appointment with Dr. Roy); Tr. 2184 (April 2015 -- "likes the [P]axil for his mood")Tr. 2797-2808 (medication adjustments); Tr. 2201 (July 2015 – "states his mood has been okay – he is happy with the Prozac"); Tr. 2624 ("January 2016 – Patient reports that meds are working as evidenced by decrease in irritability."); Tr. 2806 (March 2017 – Plaintiff's report that he was "doing fairly well"); Tr. 3309 (September 2017 – Plaintiff's report that he was "doing well"); Tr. 3312 (October 2017 – Plaintiff's report that he was "doing well"); Tr. 3310, 3313 (March and October – continuing Plaintiff's medications as established in June 2017); *see also* Tr. 89, 100-01, 106-07 (testimony from Plaintiff and his mother about how Plaintiff did better on mediation).

The undersigned finds the ALJ reasonably determined that, although Plaintiff certainly demonstrated mental health problems, the records as a whole did not support Dr. Patrick's "severe restrictions". (Tr. 53). This is true even though one can read the records in such a way that supports Dr. Patrick's opinion because this Court affirms even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The differences Plaintiff points to are simply differences of degree, and the records can be read to support the ALJ's interpretation thereof. The ALJ provided a meaningful, supported explanation of her consideration of Dr. Patrick's consultative examination opinion. No more was required.

Dr. Johnston

Plaintiff next contends the ALJ erred in discounting certain opinions from Dr. Johnston, the state agency psychologist who reviewed Plaintiff's records at the reconsideration level. The ALJ assigned this opinion "[s]ignificant weight". (Tr. 55). She explained that she found the opinion largely supported, explaining how it was consistent with the records as a whole. *See* Tr. 55-56. She further provided specific explanation for those portions of the opinion she rejected. *See id.*

Plaintiff objects specifically to the ALJ's rejection of Dr. Johnston's opinion that Plaintiff "may need additional breaks." *See* Doc. 11, at 14-15; *see also* Tr. 1287. The ALJ explained: "The State agency psychological consultant's opinion regarding the cla[i]mant maybe needing additional breaks[] appears to be speculative and based upon an ideal work environment rather than the most the claimant can do despite his impairments." (Tr. 55). Plaintiff argues that the ALJ's "reasoning . . . is confusing" and "[i]t does not make sense why this limitation was 'speculative,' and the rest of the opinions . . . were found credible." (Doc. 11, at 15). The undersigned disagrees. It is precisely Dr. Johnston's language with respect to this limitation – the use of the word "may"

23

– which supports the ALJ's rationale. That is, as to this restriction, Dr. Johnston used equivocal, rather than definitive language. Notably, as to other restrictions offered, Dr. Johnston used more definitive language: "is able to", "should", "can", or "should not". *See* Tr. 1287-88. Other courts have found this a valid reason to discount similarly equivocal opinions. *See Graham v. Comm'r Soc. Sec.*, 2019 WL 4451366, at *5 (N.D. Ohio) (finding no violation of SSR 96-8p where the ALJ failed to explain why he did not adopt specific limitations because, *inter alia*, the at-issue limitations "were not definitive as they indicated that Plaintiff 'may require some repetition' as to instructions and 'may' need assistance in making independent decisions regarding work goals"); *Slivka v. Berryhill*, 2018 WL 3340388, at *9 (N.D. Ohio), *report and recommendation adopted*, 2018 WL 3336461 ("To treat the possible limitations floated by Dr. Matyi as an affirmative finding that such limitations are mandated would improperly alter the contents of the medical source's opinion."); *Mosley v. Berryhill*, 2017 WL 1153896, at *10 (M.D. Tenn.) (an assessment of "difficulty" with an activity "does not constitute a definitive functional limitation that the ALJ was required to incorporate into the RFC"). The RFC is defined as "the most you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945. It was reasonable for the ALJ to find a restriction offered with the word "may" was not the most Plaintiff could do. The undersigned therefore finds the ALJ provided a reasoned, substantially supported explanation for discounting this particular aspect of Dr. Johnston's opinion. Again, no more was required as to this non-treating physician.

In his Brief on the Merits, Plaintiff also correctly observed that the ALJ discounted Dr. Johnston's opinion that Plaintiff "should work apart from others for the majority of his work day." (Doc. 11, at 14-15). Plaintiff, however, provided no reasoned argument regarding why this was error, focusing his argument entirely on the additional breaks limitation. *See id.* In Reply, Plaintiff

states that "the ALJ improperly evaluated certain opined limitations including the need for additional breaks *and the limitation of a work environment apart from others*", but again presents no specific argument regarding the work environment limitation. (Doc. 15, at 3) (emphasis added). As such, Plaintiff has waived any challenge to this limitation. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citation and quotation omitted).[5]

In conclusion, the undersigned pauses to note that the ALJ's RFC accounts for many mental health-related restrictions. The ALJ limited Plaintiff to "simple, routine tasks", "judgments on simple work", and "changes in a routine work setting that is repetitive from day to day with few and expected changes", no "direct public service work", being "in the proximity of the general public on an occasional basis", "occasional interaction with supervisors and coworkers" and no

---

5. Moreover, the undersigned finds the ALJ's detailed and specific explanation for rejecting this limitation is substantially supported by the record:

> With respect to the State agency psychological consultant's opinion regarding that the claimant should work apart from others for the majority of his workday, the claimant repeatedly reported . . . riding his bike, exercising at a fitness center and/or walking at the reservoir at least two to three times a week (Exhibits 7F/10, 9F/144, 14F/2, 16F/20, 18F/4, 24F/27-29 and 26F/33). He also related [] going to the lake and casino as well as "junking", visiting with friends and traveling out[] of town for a few days with his mother (Exhibits 6F/16, 11F/11, 19F/8, 21F/51-53, 22F/47 and 24F/23, 29). Thus, although the residual functional capacity finds the claimant cannot engage in direct public service work, the residual functional capacity finds the claimant can be in the proximity of the general public on an occasional basis as well as he can have occasional interaction with supervisors and coworkers when considering the foregoing.

(Tr. 56). That is, the ALJ reasonably concluded that Plaintiff's self-reported activities contradicted such a restrictive finding regarding working in proximity to others.

25

"work that requires a daily production quota". (Tr. 43). The ALJ thoroughly evaluated the evidence of record – both medical and otherwise – in reaching this determination. Again, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does so here.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.

  s/ James R. Knepp II_____
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).